1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

7

EDWARD HOMES, INC., *et. al.*,

Case No. 2:22-cv-00725-RFB-EJY

8

Plaintiffs,

**ORDER**

9

v.

10

SCOTTSDALE INSURANCE COMPANY.,
*et al.*,

11

12

Defendants.

13
14
15
16

Before the Court is Defendant Scottsdale Insurance Company's Motions for Summary Judgment. (ECF No. 70). For the following reasons, the Court denies in part and grants in part the Motion.

17

**I.    RELEVANT PROCEDURAL HISTORY**

18

The Court only summarizes the procedural history relevant to the instant Motion.

19
20
21
22
23
24
25
26
27
28

On March 28, 2022, Plaintiffs Edward Homes, Inc. ("EHI"), a Nevada corporation, and Arts District Holdings, LLC ("ADH"), a Nevada limited liability company, filed their complaint against Nationwide Insurance Company of America ("Nationwide") in state court. (ECF No. 1-1). On May 6, 2022, Defendant Nationwide removed the action to this Court pursuant to 28 U.S.C. § 1441(b). (ECF 1). Plaintiffs filed their Second Amended Complaint on May 24, 2022, which substituted Scottsdale Insurance Company ("SIC") as the Defendant in this action. (ECF No. 10). The Court granted the parties stipulation allowing Plaintiffs to amend the complaint on November 7, 2022, and Plaintiffs filed their operative Third Amended Complaint, alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing (contractual and tortious), and violation of Nevada's Unfair Claims Settlement Practices Act. (ECF No. 23-24). On

1    November 18, 2022, SIC filed its Answer. (ECF No. 35).

2         Discovery concluded on April 19, 2024. (ECF No. 69). Defendant filed the instant Motion

3    for Summary Judgment on May 10, 2024. It was fully briefed as of May 24, 2024. (ECF Nos. 71-

4    72). On July 2, 2024, Plaintiffs filed an Errata to their (ECF No. 71) Response adding the court

5    reporters' signature page to the deposition transcripts of Brock Metzka, Sam Bakke, and Elliot

6    Flood. (ECF No. 73).

7         The Courts Order on the Motion for Summary Judgment follows.

8

9    **II.    LEGAL STANDARD**

10        Summary judgment is appropriate when the pleadings, depositions, answers to

11   interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no

12   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

13   Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive

14   law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby,

15   477 U.S. 242, 248 (1986).

16        The moving party bears the burden of showing the absence of material disputes of fact.

17   Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to show specific facts

18   demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio

19   Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the court

20   views all facts and draws all inferences in the light most favorable to the nonmoving party.

21   Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

22        However, the nonmoving party may not merely rest on the allegations of his pleadings. He

23   must produce specific facts by affidavit or other evidence showing a genuine issue of fact.

24   Anderson, 477 U.S. at 256 (1986). In other words, the nonmoving party "must do more than simply

25   show that there is some metaphysical doubt as to the material facts . . . Where the record taken as

26   a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

27   issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation

28   marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility

1  determinations at the summary judgment stage. <u>Zetwick v. Cty. of Yolo</u>, 850 F.3d 436, 441 (9th

2  Cir. 2017) (citations omitted).

3

4  **III.    EVIDENTIARY RULINGS**

5          As a preliminary matter, the Court first addresses Defendant's objections to material

6  evidence produced by Plaintiffs in opposition to summary judgment, which Defendant raised in

7  its reply.

8          A "court can only consider admissible evidence in ruling on a motion for summary

9  judgment." <u>Orr v. Bank of Am., NT & SA</u>, 285 F.3d 764, 773 (9th Cir. 2002). Rule 56 requires

10  the parties to set out facts they will be able to prove at trial. <u>Id</u>. While the evidence presented at

11  the summary judgment stage does not yet need to be in a form that would be admissible at trial,

12  the proponent must set out facts that it will be able to prove through admissible evidence. <u>See</u>

13  <u>Norse v. City of Santa Cruz</u>, 629 F.3d 966, 973 (9th Cir. 2010). Before ruling on summary

14  judgment, a district court must rule on evidentiary objections *that are material to its ruling*. <u>Id</u>.

15  (emphasis added).

16          Defendant object to the Court's consideration of deposition testimony excerpted in exhibits

17  that Plaintiffs filed in opposition to summary judgment, because they lacked a court reporter's

18  certification and thus were unauthenticated. For a deposition transcript to be authenticated on

19  summary judgment, a court reporter's certification must be included. <u>Orr</u>, 285 F.3d at 774. After

20  Defendant filed its reply raising these objections, Plaintiffs filed an Errata attaching the court

21  reporter's signature page for each objected-to deposition. In any case, the Court will consider the

22  content of the deposition testimony because the witness testimony would be admissible at trial.

23  <u>Hartranft v. Encore Cap. Grp., Inc.</u>, 543 F.Supp.3d 893, 914-15 (S.D. Cal. 2021) ("The Court will

24  consider the substance of evidence that would be admissible at trial even if the form of the evidence

25  is improper so long as that same evidence may be admissible in another form."). Therefore,

26  Defendant's objections to the deposition testimony excerpts for lack of court reporter certifications

27  is OVERRULED.

28          Defendant objects to the deposition testimony of Mr. Metzka, president of Plaintiff EHI,

1    wherein he testified as to his understanding of the meaning of the term "damage" in the context of

2    the insurance policy application supplement he filled out on behalf of EHI. Defendant objects

3    under Federal Rules of Evidence 702 and 704, claiming as a lay witness, Mr. Metzka cannot testify

4    as to a legal conclusion such as the correct interpretation of a contract. However, Mr. Metzka's

5    understanding of the meaning of the word damage in the context of the insurance application is

6    directly relevant to the legal question of how the contract should be interpreted. See Century Sur.

7    Co. v. Casino W., Inc., 329 P.3d 614, 616 (Nev. 2014) (*en banc*) (if an insurance policy is

8    ambiguous, the Court must "interpret the policy to effectuate the insured's reasonable

9    expectations."). The Court finds Mr. Metzka's understanding is relevant and admissible and

10   therefore OVERRULES Defendant's objection.

11        To the extent any of Defendant's objections are not discussed in this Order, it is because

12   the Court did not rely on the objected-to evidence in reaching its ruling. For example, Defendant

13   raises numerous objections to portions of the testimony of Plaintiffs' expert witness, Elliot S.

14   Flood. Because the Court does not rely on the objected-to opinions in reaching its ruling, it does

15   not address Defendant's objections in this Order. Defendant's objections are preserved and can be

16   addressed in any forthcoming motions *in limine*.

17

18   **IV.    FACTUAL BACKGROUND**

19        The Court makes the following findings of undisputed and disputed material facts.

20        **A.  Undisputed Facts**

21        This case arises out of Plaintiff Edward Homes Inc. ("EHI") purchase of a builder's risk

22   insurance policy ("Policy") from Defendant Scottsdale Insurance Company ("SIC") to cover work

23   and materials expended in EHI's building of a bar and nightclub project ("the Project") owned by

24   Arts District Holdings, LLC ("ADH"). A fire destroyed the project on September 5, 2021, and EIH

25   made a claim on the policy. After seven months SIC sent notice that it was rescinding the policy

26   based on EHI's material misrepresentations in application documents.

27        From October 26, 2015 to March 17, 2023, ADH was the owner of real property located at

28   1022 S. Main Street, Las Vegas, Nevada ("Property"). EHI is a general contractor, with no

ownership interest in the property. Brock Metzka is the president of EHI. EHI began work on the Project in 2018; however, work halted in 2019 when a dispute and related litigation arose between ADH and its tenant. Liberty Mutual, EHI's prior builder's risk insurer, informed EHI it would not renew its builder's risk policy, prompting EHI to request its insurance broker, Leavitt Insurance Group ("Leavitt"), to find a new policy.

On July 14, 2021, Leavitt contacted Burns & Wilcox ("B&W"), an insurance broker and SIC's exclusive general agent, about finding a new builder's risk policy for the Project. Leavitt included an ACORD Commercial Insurance Application and a spreadsheet of work remaining on the Project, which identified, among other items, plumbing and electrical. Leavitt also told B&W the Project was approximately 70% complete, and construction was halted and would not resume for 90-120 days.

SIC's underwriter, Andrew Hill, reviews and accepts or rejects quotes prepared by B&W. As Mr. Hill handles between 250-300 applications per month, he left significant underwriting functions to B&W, and substantially relied on B&W for underwriting decisions. Amber Carver was B&W's Associate Managing Director of underwriting decisions who communicated with Mr. Hill daily. B&W requested the following documents from EHI/Leavitt, which Leavitt provided B&W on July 15, 2021: (a) a loss history from Liberty Mutual which showed no prior losses claimed; (b) a builder's risk application; and (c) a builder's risk mid-term addendum. B&W also ran a crime index report for the property on July 15, 2021, which indicated the area had a moderately high to high property crime rate. B&W sent Hill a conditional quote and requested authority to send the quote to Leavitt. Hill requested more information about the stoppage on construction, and a vacancy supplement application entitled DUAL E&S Property – Vacant Supplement ("Vacancy Supplement"). Leavitt provided the filled out, unsigned vacancy supplement, which stated "No" to the questions "has the property suffered any loss or damage in the past 5 years?" and "is there any unrepaired damage?" and described the expected length of vacancy due to construction stoppage as 90-120 days.

None of the documents inquired about vagrant activity or unwanted ingress. None of the documents defined the word "damage."

After receiving the requested information regarding vacancy, Hill approved the quote on July 20, 2021, and B&W through Ms. Carver advised Leavitt the quote was approved and required four documents for policy issuance 1) a signed ACORD application 2) the signed Vacancy Aupplement, 3) a "favorable inspection, within 30 days of binding," and 4) a "No Loss Letter." On July 26, 2021, Leavitt sent B&W the documents requested, which were reviewed and signed on behalf of EHI by Mr. Metzka. As before, the signed Vacancy Supplement stated the property had not suffered any loss or damage in the past 5 years, and there was no unrepaired damage. On July 28, 2021, B&W with SIC's authority, issued a binder policy pending issuance of the final policy with a retroactive effective date of July 12, 2021.

B&W hired AFIRM for an on-site inspection as required by SIC. The inspection was completed on August 4, 2021, and the AFIRM report was provided to SIC. The report provided a general overview of the risk and stated there was a moderate risk of "hazard severity" and "area crime," "area stability" was listed as "improving," and the opinion of the risk was "average." The report stated the building had adequate "site fencing" and "site lighting." The report stated, "no issues noted" under "vandalism & malicious mischief." The report attached images of the under-construction building, which showed a wall with graffiti extending the height of the structure, and a baby stroller and other debris inside the building. B&W reviewed the AFIRM report and did not identify any discrepancies between the report and the information provided by EHI in the application process. B&W forwarded the AFIRM report to SIC without any recommendations or comments. On August 16, 2021, Leavitt provided EHI with a copy of the Policy. EHI did not review it prior to the September fire.

The AFIRM report went directly to SIC's underwriting file and was not reviewed by SIC underwriter Hill before the September 2021 fire. Hill testified he did not thoroughly review the files that day because he had several meetings and was covering another desk.

The Policy covered "ground up construction" with limits up to $6,000,000 and the named insured was EHI. It covered "direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss" subject to terms, conditions, limitations, and exclusions.

The Policy provided: "We may adjust losses with the owners of lost or damaged property

- 6 -

if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property."

The Policy also contained a "Project Protective Safeguards Endorsement" ("PPSE") that added a condition of coverage, which required EHI to maintain fencing, lighting, and an automatic sprinkler system at the time of a loss caused by fire or other casualty. Ms. Carver of B&W testified that the PPSE Should not have been included in the Policy, because as a builder's risk policy, it covered unfinished construction, such that the PPSE would not apply as an exclusion until the build included the described safeguards. She further testified she only included the PPSE exclusion in the policy because she assumed the Project had sprinklers, however EHI never represented there were sprinklers, the inspection by AFIRM did not indicate any sprinklers were present, and no issue as to the lack of sprinklers was raised by the AFIRM report or B&W.

On September 5, 2021, a fire destroyed the Project, and EHI submitted a fire loss claim on September 7, 2021. After an interview with Metzka, a cause and origin ("C&O") expert hired to investigate the cause of the fire informed the SIC Claims Consultant ("CC") that Metzka reported the Property had been cleared out every two weeks due to homeless people getting inside. The C&O expert also indicated evidence of "vagrant activity" in the building was found, including smoking material, lighters, sterno cans, and evidence of fireworks being used in and around the building.

SIC referred the claim to a fraud investigator in SIC's Special Investigation Unit, Scarlett Halverson, as part of general protocol on large fire loss claims.

After an initial review the SIC CC noted that the Policy contained the PPSE and that the AFIRM report confirmed substantial compliance with the required protective safeguards. On September 27, 2021, the CC conferenced with SIC upper management to discuss the claim. The same day SIC retained outside counsel Robert Nelms, Esq. to provide legal advice regarding the claim and the issue of compliance with the PPSE at the time of the fire.

Throughout November, the SIC CC and a public adjuster retained by EHI exchanged documents estimating the amount of loss and outstanding questions on how much construction had

been accomplished prior to the fire. EHI's public adjuster provided a report on amounts disbursed on the project as of June 24, 2020 and building plans, and asserted the information was enough for SIC to prepare a repair estimate and issue an advance $1.5 million payment on the claim.

On November 30, 2021, the C&O report was provided to SIC, which stated the ignition source of the fire could not be identified to a reasonable degree of scientific certainty, but the misuse of smoking, cooking, and fireworks materials, as well as human involvement, could not be ruled out. The report summarized an interview with Metzka who stated, "there had been ongoing problems with vagrants breaking in and occupying the structure."

On December 1, 2021, SIC issued a reservation of rights ("ROR") letter to EHI summarizing the facts of the loss based on the investigation to date, the Protective Safeguards conditions that were being investigated pursuant to the PPSE, and a list of documents and information needed to evaluate the scope of repairs. The claims consultant informed EHI's public adjuster that no advanced payment would be made because the claim was still being investigated.

On December 2, 2021, an attorney retained by EHI, Robert Walsh, Esq. sent a response to the ROR letter regarding the PPSE requirements. The letter stated as to fencing, the east and west of the property had solid walls over 12 feet high, and otherwise, the building was "completely plywood and screwed off" and all access points were "locked and fenced;" as to lighting, the property was illuminated from streetlights at the front and rear of the property, there was no power at the property, and any other lighting would have encroached on the public right of way; and "inasmuch as the building was under construction, there was obviously not a sprinkler system installed." The letter threatened suit against SIC if coverage was not confirmed and payments issued within 30 days.

On December 3, 2021, EHI's public adjuster sent a Dropbox link with "all of the raw data" supporting the level of construction at the time of the fire and demanded payment of the claim. On December 9, 2021, Leavitt forwarded to the SIC CC a building repair estimate. On December 14, 2021, the CC consultant informed EHI's public adjuster that SIC would not issue an advance payment due to the ongoing investigation of the claim.

To further investigate the coverage question with regards to EHI's compliance with the

PPSE, SIC attorney Nelms examined Metzka under oath on January 11, 2022. On March 1, 2022, the examination under oath transcript was returned signed by Metzka with no changes. Metzka testified that during the period that construction was halted, EHI cleaned the site and dealt with reports of "homeless breaking in," on approximately three or four occasions, wherein police visited the site. Metzka described one occasion where he observed that there had been holes cut through the plywood that was screwed to the building to prevent entry. When Nelms inquired as to what the homeless might be looking for, and suggested they might have intended to steal copper piping or wiring, Metzka testified he had observed that copper had been taken on one occasion. In response to Nelms' questioning, Metzka could not recall the timing of these incidents, and did not know whether they occurred before or after he filled out the insurance application documents on behalf of EHI.

After receiving the transcript of Metzka's examination, SIC's underwriting department decided to rescind the policy. On March 25, 2022, SIC rescinded the Policy based on material misrepresentations on the applications that there were no prior losses or damage to the Property within the past 5 years. SIC sent notice of the rescission in a letter from attorney Nelms, stating that had the information regarding a history of break-ins and problems with transients/homeless persons been disclosed, SIC would have rejected the risk. SIC issued a refund check for EHI's premium amount.

SIC's investigation into the PPSE compliance issue was never completed and no conclusion was reached. On April 5, 2021, SIC, through its fraud investigator Mr. Halverson, made a referral to the National Insurance Crime Bureau ("SICB") reporting SHI for fraud. Her report stated that it was confirmed in Metzka's examination under oath that "protective maintenance measures were not being maintained." In a deposition of Ms. Halverson, she stated that failure to maintain a preventative measure would not constitute fraud. When asked why she included that information as a reason fraud may have occurred in the NICB referral report, she stated "I cannot even tell you."

As a result of SIC not paying EHI's claim, EHI could not resume work on the Project. The Project was never completed and ADH was forced to sell the Property in 2023.

1

### B. Disputed Facts

2      The Court makes the following findings of disputed fact.

3      The parties dispute the timing of the "homeless break-in" wherein Metzka testified he

4  observed copper had been stolen. SIC contends that Metzka's testimony in the examination under

5  oath confirmed that he had made a material misrepresentation in the insurance applications. EHI

6  contends that Nelms' questioning was confusing and that Metzka did not mean to say that he had

7  observed copper having been stolen from the Project.

8      The transcript of the examination reveals that in response to Nelms' questioning, Metzka

9  could not recall the timing of the break-in incident involving copper theft, and did not know

10  whether it occurred before or after EHI filled out and signed the insurance application forms.

11      The parties further dispute whether SIC knew or should have known that copper was not

12  in fact installed in the Project at the time the insurance application was completed, and at the time

13  of the fire. In his subsequent deposition in this action, Metzka testified that no copper had been

14  installed at the Project at the time of the fire. The spreadsheet identifying remaining work which

15  Leavitt provided B&W on July 14, 2021, showed that no copper had been installed. Metzka's

16  subsequent deposition further clarified that he understood Nelms' question to be inquiring about

17  whether he had observed any copper theft *in general* after a homeless break in, but not specifically

18  regarding the Project that was covered by the SIC Policy. The Court finds Nelms' questioning as

19  set forth below could have caused confusion:

20      Q. Did you ever personally go down and inspect the property following one of the break-
21      ins by the homeless?

22      A. Yes.

23      Q. And what, if anything, did you see?

24      A. Debris, trash. They cut through the wood walls.

25      Q. Why were they cutting through the wood walls do you suppose?

26      A. They're homeless, I guess. I don't know what answer to give on that one.

27      Q. Well, for example, I know from other matters that I've handled where there have been
28      repeated homeless intrusions into buildings that were vacant but sometimes they'd break

through the walls to get access to the copper piping and copper cabling inside the walls. Did you see anything like that?

Q. Of course.

A. When you say "of course," can you describe for me what you witnessed?

Q. Yes. They would break-in and steal the copper.

. . .

Q: Can you describe for me, with any specificity, what you observed was taken from the building?

A: It was particularly copper.

Metzka explained in his subsequent deposition that he understood Nelms to be asking about homeless intrusions into EHI buildings projects in general. In light of Nelms' reference to "other matters" in his question, the Court does not find Metzka's later testimony is "sham" testimony, as Defendant argues. See Van Asdale v. International Game Technology, 577 F.3d 989, 998-99 (2009) (the "sham" rule should not be invoked where "the non-moving party is elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition" based on "a mistake"). The credibility of Metzka's testimony is an issue of fact for the jury.

The parties further dispute whether EHI made a material misrepresentation on the insurance applications based on conflicting interpretations of the meaning of the word "damage" in the application. SIC maintains that Metzka made a material misrepresentation on the application for insurance when he stated there was no "prior loss or damage within the past five years." Metzka testified in his examination under oath by SIC attorney Nelms that he understood "damage" as meaning a monetary loss and explained he would not consider someone cutting into plywood or gaining access to the property as "damage" because "it's not structurally hurting the integrity" and that during construction, plywood being broken or a pipe being accidentally cut were common occurrences that would not be reported as a loss.

SIC maintains the meaning of "damage" in the application documents is unambiguous and required Metzka to disclose that holes had been cut into plywood on the outside of the building and copper was stolen by homeless people.

1          The parties further dispute whether the undisclosed homeless break-ins were material to

2    the risk SIC was asked to assume, such that SIC would not have issued the policy had it known of

3    the break-ins. SIC's former Associate Vice President of Contract Underwriting testified that had

4    the break-ins been disclosed, SIC would not have authorized B&W to proceed with the policy.

5    Plaintiffs point out that evidence of "vagrant activity" and break-ins was apparent from the AFIRM

6    inspection report provided to SIC by B&W from the graffiti and debris depicted in the photographs

7    attached to the report. Mr. Hill of SIC testified that the AFIRM inspection is intended to identify

8    "serious issues" not represented on the application such as "a caved-in roof." Because the report

9    did not identify any issues, even though the property had evidence of vandalism, Plaintiffs dispute

10   that the vagrant activity and damage to plywood was in fact material to SIC's evaluation of the

11   risk. Likewise, Plaintiffs argue that the crime report revealing the Property was in an area with a

12   high rate of property crime as evidence that the threat of "vagrant activity" was known to SIC

13   when it accepted the risk.

14         The further parties dispute SIC's basis for rescission. SIC claims it rescinded the policy

15   based on EHI's failure to disclose prior damage to the Property and the ongoing transient issues.

16   Plaintiffs point to the extended delay in SIC's investigation, the sending of the ROR letter

17   identifying questions as to the PPSE exclusion rather than any allegation of material

18   misrepresentation, the fact that compliance with the PPSE exclusion was infeasible while the

19   building was under construction, the lack of any evidence of the materiality of the vagrant activity

20   other than the biased testimony of SIC and B&W's representatives in hindsight, and the fact that

21   SIC had evidence of vagrant activity since the date of the AFIRM report, but waited until March

22   25, 2022 to rescind the policy. Plaintiffs construe these disputed facts as evidence that SIC's

23   explanation for the rescission was false, and that SIC was searching for a pretextual basis to deny

24   the claim.

25         Finally, SIC claims there is no evidence it acted with oppression, fraud, or malice sufficient

26   to support a punitive damages instruction at trial. Plaintiffs point to the fact that SIC issued the

27   ROR regarding the PPSE as evidence of pretext to scour the file and find something to support

28   denial of the claim. Plaintiffs also point to SIC referral of EHI to the NICB for fraud based on the

failure to comply with the PPSE, despite the fact that it had rescinded the policy on a separate and

unrelated bases, that SIC had not concluded its own investigation into PPSE compliance, and

despite Ms. Halverman's knowledge that non-compliance does not constitute fraud. Plaintiffs

claim SIC made the referral with the intent to harm EHI, which put EHI at odds with insurers such

that EHI could not obtain insurance to finish the Project.

## V.    DISCUSSION

The Court turns to the merits of Defendant's Motion for Summary Judgment.

For the following reasons, the Court finds that genuine disputes of fact exist that are

material to the following claims preclude summary judgement: (1) Plaintiffs' first cause of action

for breach of contract; (2) EHI's second cause of action for tortious breach of the implied covenant

of good faith and fair dealing ("insurance bad faith"), and (3) EHI's third cause of action for

violation of Nevada Revised Statute § 686A.310, the Unfair Claims Settlement Practices Act. The

Court further denies summary judgment on Plaintiffs' prayer for declaratory relief and EHI's

prayer for punitive damages.

However, the Court grants summary judgment on ADH's second cause of action for

insurance bad faith, and third cause of action of violation of the Nevada Unfair Claims Settlement

Practices Act, because ADH lacks standing to bring those claims, as explained in detail below.

### A. Rescission

Defendant SIC asserts it is entitled to summary judgment on all of Plaintiffs' claims

because it validly rescinded the insurance contract with EHI under Nevada's rescission statute.

N.R.S. 687B.110(2)-(3). The rescission statute provides in relevant part: "[m]isrepresentations,

omissions, concealment of facts and incorrect statements shall not prevent a recovery under an

[insurance] policy or contract unless either: (2) Material either to the acceptance of the risk, or to

the hazard assumed by the insurer; or  (3) The insurer in good faith would either not have issued

the policy or contract, or would not have issued it at the same premium rate, if the true facts had

been made known to the insurer as required either by the application for the policy or contract or

otherwise." Id.

1    Defendant's argument that it properly rescinded the Policy turns on its assertion that EHI's

2    statement on applications that there had been no prior loss or damage to the Project in the insurance

3    application documents was a material misrepresentation. Defendant's application documents never

4    inquired as to any history of vagrant activity or break-ins at the Property—the sole alleged

5    misrepresentation was that this information was not disclosed in response to the question asking

6    about "loss or damage within the last five years."

7    First, Plaintiffs raise a genuine dispute of fact as to whether EHI's response to the question

8    was in fact a misrepresentation, and points to Metzka's understanding of the term "damage" to

9    mean damage to the Project resulting in monetary loss that would be reported or result in a claim

10   for insurance coverage. Accordingly, "damage" in the context of the insurance application

11   documents would not include the break-ins, holes in plywood, or theft of copper if none of those

12   incidents resulted in monetary loss.

13   Under Nevada law, an insurance policy is interpreted "from the perspective of one not

14   trained in law or in insurance, with the terms of the contract viewed in their plain, ordinary and

15   popular sense." Siggelkow v. Pheonix Ins. Co., 846 P.2d 303, 304 (Nev. 1993). The policy is to

16   be considered as a whole to give "reasonable and harmonious meaning to the entire policy," id.,

17   and interpretation of the policy should not lead to an absurd or unreasonable result, Reno Club,

18   Inc. v. Young Inv. Co., 182 P.2d 1011, 1017 (Nev. 1947).

19   To the extent that the question of whether Defendant properly rescinded the contract turns

20   on the meaning of the term "damage" in the application documents, the Court finds its meaning is

21   ambiguous. As applied to the facts here and in the context of the policy as drafted, the word

22   "damage" leads to "multiple reasonable interpretations" and is thus ambiguous. Century Sur. Co.

23   v. Casino W., Inc., 130 P.3d 614, 616 (Nev. 2014). One reasonable interpretation, especially

24   considered in the context of the phrase "loss or damage," is that damage would refer to damage to

25   covered Property that resulted in monetary loss and would potentially result in an insurance claim.

26   Under that reasonable interpretation, holes in the plywood that was used to prevent ingress into

27   the building under construction would not be required to be disclosed as "damage."

28   Ambiguities under the Policy are to be interpreted against the drafter, which is SIC, and

interpreted to "effectuate the insured's reasonable expectations." Id. Whether Metzka's interpretation and expectations regarding the term "damage" were reasonable under the circumstances is a triable issue of fact.

Even under Plaintiffs' proffered interpretation of the term damage, a jury could find the failure to disclose theft of copper materials from the Project was a misrepresentation, because theft of valuable building materials could amount to monetary loss that would be covered by the Policy. However, whether Metzka *did* in fact fail to disclose the theft of copper is a genuine dispute of fact. Likewise, whether SIC's interpretation of Metzka's testimony in response to SIC attorney Nelm's question as confirming that copper had been stolen from the Project prior to completion of the insurance application was a reasonable interpretation is a triable issue of fact. The jury could find from the record that no copper had been installed in the building at the time of fire, that SIC knew or should have known that no copper was installed, and that Metzka's testimony as to copper was unclear, such that SIC's claim of material misrepresentation based on that testimony was unjustified.

Setting the side the copper theft issue, even if EHI should have disclosed the break-ins which indisputably caused damage to plywood, a genuine dispute of fact exists as to whether that information was known to SIC when it accepted the risk and issued the Policy. Plaintiff has provided sufficient evidence for a jury to find that SIC knew of the problem of homelessness and property crime in the area and knew that the building had been vandalized and broken into, but accepted the risk and issued the Policy anyway. Whether SIS had knowledge of the 'vagrant activity' based on the AFIRM report and crime reports "is an issue of fact to be determined by the jury." Vigoren v. Transnational Ins. Co., 482 P.2d 96, 98 (Nev. 1970). If an insurer has knowledge of a misrepresentation, it waives the right to rescind the contract. Morales v. Prudential Ins. Co. of Am., 238 P.3d 840 (Nev. 2008). Defendant's argument that it was not required to investigate all the information in the insurance file to discover the alleged misrepresentation is unavailing—Nevada public policy militates against allowing an insurer to wait until after a loss has occurred to diligently investigate. See Violin v. Fireman's Fund Ins. Co., 406 P.2s 287, 290 (Nev. 1965) ("We prefer the diligence to be exercised at an earlier time—when the application for insurance is

1  taken.").

2      Lastly, a genuine dispute of material fact exist as to the materiality of the alleged

3  misrepresentations. Materiality is typically a question of fact for the jury, and "only where

4  reasonable minds cannot differ may the issue be resolved as a matter of law." Powers v. United

5  Servs. Auto. Ass'n, 979 P.2d 1286, 1289 (Nev. 1999). "Where materiality must be shown by

6  matters outside the terms of the contract, it is a question of fact." Id.

7      The Court finds reasonable minds could differ as to whether the record demonstrates that

8  the information SIC claims should have been reported was material to its acceptance of risk, and

9  that it would not have issued the same policy had it known of the information. Based on the facts

10 that the AFIRM inspection report included pictures showing evidence of vandalism and debris and

11 a baby stroller in the building under construction, and that AFIRM and B&W determined that

12 those conditions were not inconsistent with the information provided by EHI in the insurance

13 application, a reasonable factfinder could conclude that these issues were not in fact material.

14 Likewise, the fact that the subject of SIC's investigation of the claim from September 2021 to

15 March of 2022 was the PPSE compliance issue, and that the ROR letter identified that as the sole

16 issue preventing payment on the policy, rather than any material misrepresentation, could lead a

17 jury to find the misrepresentation was not material. Id. at 1288-89 (holding there was ample

18 evidence for a jury to find that the alleged misrepresentation was not material where the insurer's

19 investigation was commenced on a separate and unrelated issue).

20     In light of the above material disputes of fact, Defendant has not met its burden on summary

21 judgment to show that it properly rescinded the insurance contract as a matter of law. The Court

22 therefore denies summary judgment on Plaintiffs' claims for breach of contract.

23              **B.  Breach of the Covenant of Good Faith and Fair Dealing**

24     Plaintiffs EHI and ADH bring a claim for tortious breach of the covenant of good faith and

25 fair dealing ("bad faith").[1] For the following reason, the Court finds issues of fact preclude

26

27     [1] Defendant cites to Plaintiffs' Complaint as alleging both contractual and tortious bad faith. The Court finds
   that Plaintiffs are not in fact arguing for contractual bad faith on summary judgment—their arguments are solely based
28 on a tortious bad faith claim. To the extent Plaintiffs are also bringing a claim for contractual bad faith, the Court
   dismisses that claim, because Plaintiffs do not argue that the terms of the insurance contract were "literally complied
   with." See Shaw v. CitiMortgage, Inc., 201 F. Supp. 3d 1222 (D. Nev. 2016) ("it is well established that a claim

summary judgment on EHI's bad faith claim, but grants summary judgment on ADH's bad faith claim, due to ADH's lack of standing.

A breach of the implied covenants can give rise to tort liability when the contract is between an insurer and insured. Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919, 923 (Nev. 1991). Under Nevada law, an insurer fails to act in good faith when it refuses "without proper cause" to compensate the insured for a loss covered by the policy. Pemberton v. Farmers Ins. Exchange, 858 P.2d 380, 382-83 (Nev. 1993) (quotations omitted). To prevail on a claim for bad-faith refusal, the insured must establish "'legal entitlement' and unreasonable conduct by the insurer concerning its obligations to the insureds." Id. at 384. "Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct." Guar. Nat. Ins. Co. v. Potter, 912 P.2d 267, 272 (Nev. 1996).

The reasonableness of SIC's conduct concerning its obligations to EHI is a question of fact for the jury. The record reflects that SIC issued the subject policy without diligently investigating the contents of the application, added the PPSE exclusion despite the fact that the required safeguards—such as automatic safeguards—were impossible to comply with given the covered Property was under construction, opened an investigation into EHI's claim based on the PPSE compliance issue which was never concluded, sent a ROR letter about the PPSE issue which did not mention material misrepresentations, after seven months ultimately rescinded the Policy based on misrepresentations unrelated to the PPSE, and reported EHI to the NICB for fraud based on noncompliance with the PPSE, despite the fact that there had been no finding of noncompliance, and noncompliance would not constitute fraud. A jury could find from this evidence that SIC's course of conduct with regards to its obligations to EHI was unreasonable and that SIC acted with knowledge that it had no reasonable basis to deny the EHI's fire loss claim. See Powers, 962 P.2d at 604 (finding a triable issue as to bad faith because there was "abundant evidence" that the insurer's "investigation was improper, incomplete, poorly done, [and] in violation of [its] own procedures").

---

alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim") (interpreting Nevada law).

Therefore, SIC has failed to establish its burden on summary judgment as to EHI's tortious bad faith claim. See United Fire Ins. Co. v. McClelland, 780 P.2d 193, 197 (Nev. 1989) ("[A] jury question on insurer's bad faith arises when relevant facts are in dispute or when facts permit differing inferences as to the reasonableness of insurer's conduct.").

### i. ADH Lacks Standing to Bring an Insurance Bad Faith Claim Against SIC

ADH was not a party to the insurance contract between EHI and SIC but asserts a claim for bad faith against SIC, asserting its rights as an intended third-party beneficiary of the builder's risk Policy. To assert a bad faith claim, Nevada law requires a contractual relationship to the insurer. United Fire Ins. Co. v. McClelland, 780 P.2d 193, 197 (Nev. 1989). However, the Nevada Supreme Court has suggested that a third-party claimant who is a specific intended third-party beneficiary to an insurance contract can assert a bad faith claim. Gunny v. Allstate Ins. Co., 830 P.2d. 1335, 1336 (Nev. 1992) (citing McLelland, 780 P.2d at 197-98).

Plaintiffs cite language in the builder's risk policy at issue demonstrating an intent to benefit ADH as the owner of the covered Property. The Court finds that ADH may be a specific intended third-party beneficiary under the insurance policy. However, the Court declines to recognize standing on the part of ADH where ADH is not a third-party claimant on the policy. Because ADH made no claim to SIC for any benefits it was due under the Policy, there is no "fiduciary-like duty between an insurer and insured" between SIC and ADH that would give rise to a bad faith claim based upon the unreasonableness of SIC's conduct with regards to its obligations to ADH. Powers, 962 P.2d 596, 603 (1998). The Nevada Supreme Court has not endorsed an intended third-party beneficiary or co-insured bad faith claim where the beneficiary/third party co-insured made no claim on the insurance policy. See generally Bergerud v. Progressive Cas. Ins., 453 F. Supp. 2d 1241, 1246-48 (D. Nev. 2006).

The Court therefore grants summary judgment as to ADH's bad faith claim for lack of standing, because ADH made no claim on the policy.

### C. Violation of the Nevada Unfair Claims Practices Act (NRS 686A.310)

Plaintiffs claim SIC violated subparts 1(a)-(g), (k) and (n) of the Nevada Unfair Claims Settlement Practices Act. N.R.S. 686A.310 et seq.

As an initial matter, the Court incorporates its reasoning as to ADH's standing as discussed above. Because ADH is not a "claimant" or "insured" as defined under the statute, the Court grants summary judgment on ADH's unfair practices claim based on standing.

The Court addresses each subpart of EHI's unfair practices claim in turn. For the following reasons the Court grants summary judgment as to EHI's claim under N.R.S. 686A.310 1(b) and (k), and denies summary judgment as to (a), (c), (d)-(f) and (n).

**(a) Misrepresenting to insureds or claimants pertinent facts or insurance policy provisions relating to any coverage at issue**

The Court finds a genuine dispute of fact exists as to whether SIC improperly included the PPSE in the Policy and misrepresented pertinent facts regarding that provision in its investigation of EHI's compliance with the PPSE.

Likewise, the Court finds a genuine dispute of fact exists as to whether SIC made misrepresentations in its letter providing notice of rescission.

**(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims under insurance policies.**

The Court finds Defendant has established that it reasonably promptly responded to communications from Plaintiff and Plaintiff's representatives, and Plaintiff has not produced evidence sufficient to raise a genuine dispute. The Court therefore grants summary judgment on the subpart (b) claim.

**(c) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policy.**

The Court finds Defendant has failed to meet its burden on summary judgment to establish that no genuine dispute exists as to whether it had reasonable standards for the prompt investigation and processing of claims arising under the Policy. A jury could infer from the lack of written standards proffered by Defendant, the delay in the PPSE investigation, and the delay in the separate material misrepresentation investigation, that SIC did not adopt and implement reasonable standards. See Estate of Lomastro ex rel. Lomastro v. Am. Family Ins. Group, 195 P.3d 339 (Nev. 2008) (holding disputed issues of fact about the processing of the claim, including an extended delay without affirming or denying the claim and insufficient explanation for the denial of the

claim were sufficient to defeat summary judgment on a bad-faith practices claim). The Court therefore denies summary judgment on subpart (c).

**(d) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.**

The Court finds the record is unclear as to when EHI submitted all required proof of loss requirements, and a dispute of fact exists as to the reasonableness of SIC's timing. Defendant has therefore failed to meet its burden on summary judgment for subpart (d).

**(e) Failing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear.**

Consistent with the Court's findings on rescission and bad faith, the Court finds a genuine dispute of fact as to <u>when</u> SIC's liability became reasonably clear. It is undisputed that SIC made no settlement offer. Therefore, Defendant has not met its burden to establish there is no genuine dispute of material fact as to subpart (e).

**(f) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.**

It is undisputed that SIC made no settlement offer. EHI has instituted this litigation. Whether and how much EHI will ultimately recover is an issue for trial. Therefore, the Court denies summary judgment as to subpart (f).

**(k) Delaying the investigation or payment of claims by requiring an insured or a claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.**

Defendant has established that it did not require SIC to submit subsequent formal proof of loss forms containing substantially the same information as prior reports. Plaintiffs have not produced evidence sufficient to create a genuine dispute as to this issue. The Court therefore grants summary judgment as to subpart (k).

**(n) Failing to provide promptly to an insured a reasonable explanation of the basis in the insurance policy, with respect to the facts of the insured's claim and the applicable law, for the denial of the claim or for an offer to settle or compromise the claim.**

The Court finds that a triable issue of fact exists as to whether SIC's failure to provide EHI the explanation for its denial of the claim until seven months after the claim was filed was a violation of this subpart. The Court further finds a triable issue of fact as to whether SIC's explanation was reasonable.

In sum, the Court grants summary judgment as to EHI's unfair practices claim based on subparts (b) and (k), and denies summary judgment as to subparts (a), (c), (d-f), and (n).

### D. Punitive Damages

Finally, SIC moves for summary judgment on Plaintiffs' prayer for punitive damages. Whether punitive damages are warranted is a question for the Court, however the Court must determine "whether, as a matter of law, the plaintiff has offered sufficient evidence . . . to support a punitive damages instruction." Hester v. Vision Airlines, Inc., 687 F.3d 1162, 1172 (9th Cir. 2012).

Punitive damages are available for an insurance bad faith claim. Great Am. Ins. Co. v. Gen. Builders, Inc., 934 P.2d 257, 263 (Nev. 1997).[2] A plaintiff can obtain punitive damages where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, express or implied." N.R.S. § 42.005(1). In actions "brought against an insurer who acts in bad faith regarding its obligations to provide insurance coverage," the common law definitions of oppression, fraud, and malice apply. N.R.S. § 42.005(2). Oppression occurs when the plaintiff is subjected to "cruel and unjust hardship in conscious disregard of his rights." Ainsworth v. Combined Ins. Co. of America, 774 P.2d 1003, 1012 (Nev. 1989). "Malice refers to conduct which is intended to injure a person or conduct with a conscious or deliberate disregard of the rights or safety of others." Granite Cosntr. Co. v. Rhyne, 817 P.2d 711, 713 (Nev. 1991).

EHI claims SIC acted with conscious disregard of its rights when it referred EHI to the NICB for fraud based on noncompliance with the PPSE, despite the fact no finding had been made that EHI failed to comply, and that even if it had, PPSE noncompliance would not constitute fraud. When SIC's fraud investigator was asked in her deposition why she made this referral, her response

---

[2] Because the Court grants summary judgment as to ADH's insurance bad faith claim, ADH cannot recover punitive damages.

1    was "I cannot even tell you." Referral to the NICB for fraud significantly damaged EHI's ability

2    to obtain insurance as a general contractor. A jury could find SIC made the referral with a

3    conscious disregard of EHI's rights.

4        The Court therefore finds the disputed evidence supports allowing relief for punitive

5    damages to proceed and denies summary judgment on EHI's prayer for punitive damages.

6

7    **VI.    CONCLUSION**

8        For the foregoing reasons, **IT IS ORDERED** that Defendant's (ECF No. 70) Motion for

9    Summary Judgment is **GRANTED in part** and **DENIED in part**. The Court addresses each cause

10   of action as follows:

11       (1) Defendant's Motion on Plaintiffs' first cause of action for breach of contract is

12   DENIED;

13       (2) Defendant's Motion on EHI's second cause of action for tortious breach of the implied

14   covenant of good faith and fair dealing is **DENIED**, but **GRANTED** as to ADH;

15       (3) Defendant's Motion on EHI's third cause of action for violation of the Nevada Unfair

16   Claims Settlement Practices Act is **DENIED**, but **GRANTED** as to ADH;

17       (4) Prayer for relief:

18           Defendant's Motion on Plaintiffs' prayer for declaratory relief is **DENIED**;

19           Defendant's Motion on EHI's prayer for punitive damages is **DENIED** but

20           **GRANTED** as to ADH's prayer for punitive damages.

21       **IT IS FURTHER ORDERED** that the parties shall file a proposed joint pretrial order by

22   **May 9, 2025**.

23

24   **DATED:** March 31, 2025.

25

26   _____

27   **RICHARD F. BOULWARE, II**

28   **UNITED STATES DISTRICT JUDGE**